**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-03180-RM-MJW

CYRUS LASHKARI, Derivatively on Behalf of Nominal Defendant, CHIPOTLE MEXICAN GRILL, INC.,

Plaintiff,

v.

STEVE ELLS,
MONTGOMERY F. MORAN,
PATRICK J. FLYNN,
JOHN S. CHARLESWORTH,
DARLENE J. FRIEDMAN,
ALBERT S. BALDOCCHI,
NEIL W. FLANZRAICH,
STEPHEN GILLETT, and
KIMBAL MUSK,

Defendants,

-and-

CHIPOTLE MEXICAN GRILL, INC., a Delaware Corporation,

Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**
***[PUBLIC REDACTED VERSION]***

---

Plaintiff Cyrus Lashkari ("Plaintiff"), derivatively on behalf of nominal defendant Chipotle Mexican Grill, Inc. ("Chipotle" or the "Company"), brings the following Verified Stockholder Derivative Complaint (the "Complaint") against certain current and former members of the Chipotle board of directors (the "Board" or "Chipotle Board") for breaching their fiduciary duties and violations of the federal securities laws. The allegations of the Complaint are based on the knowledge of Plaintiff as to himself, and on information and belief, including the investigation of counsel and review of publicly available information and internal Company documents produced in response to Plaintiff's demand for the inspection of books and records pursuant to Section 220 of the Delaware General Corporation Law (the "Section 220 Demand"), as to all other matters.

## INTRODUCTION

1. This action arises from (a) the Chipotle Board's knowing and utter failures to oversee and address the significant risks of food-borne illness at the Company's thousands of restaurants, and (b) the substantial and growing harm caused to the Company as a result of those failures.

2. Chipotle operates a chain of well-known Mexican-food restaurants in the United States and overseas. Since the Company's founding in 1993, Chipotle has enjoyed explosive growth, having successfully branded itself as a healthy alternative to traditional fast-food restaurants.

3. Integral to the Company's success has been its stated commitment to utilizing the freshest possible ingredients. While that commitment helped Chipotle garner a loyal following and fuel the Company's remarkable growth, it also exposed the Company's customers to serious food-safety risks.

4. As explained in more detail below, despite having experienced food-borne illness outbreaks in or around 2008, acknowledged the risk of additional food-safety incidents in the future, and recognized that the Company's rapid expansion was rendering its existing food-safety audit systems increasingly ineffective, the Chipotle Board inexplicably failed to take any steps to implement adequate internal controls to ensure that (a) it received timely information concerning actual or potential food-borne illness issues, or (b) the Company could act to prevent, mitigate or address future, foreseeable food-safety incidents.

5. REDACTED [redacted]

6. In 2015, the risks facing the Company began to fully materialize. Beginning in July of that year, a series of food-borne illness outbreaks affected Chipotle restaurants in Washington, California, Minnesota, Oregon, New York, Ohio, Minnesota, Kansas, Oklahoma, and Massachusetts. The series of outbreaks attracted extensive negative press and undermined Chipotle's hard-won reputation for serving fresh, healthy food.

7. The harm to Chipotle was compounded by the Company's dysfunctional and woefully inadequate response. For example, the Board's abject failure to implement adequate information and reporting systems in response to its food-borne illness epidemic prevented crucial information from reaching the Board in a timely manner. And even when the Board did receive information concerning the outbreaks, whether through the press or through the existing deficient

information systems, the Board repeatedly and knowingly failed to take action to protect the Company's interests.

8. REDACTED [redacted]

9. Through this action, Plaintiff seeks to hold certain current and former members of the Chipotle Board accountable for their breaches of fiduciary duty and the harm flowing to the Company therefrom.

**JURISDICTION AND VENUE**

10. The claims asserted herein arise in part under Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"). Jurisdiction is conferred by the Exchange Act, and supplemental jurisdiction over Plaintiff's state law claims is conferred by 28 U.S.C. § 1367.

11. This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more

of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding in violation of fiduciary duties owed to Chipotle occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

## THE PARTIES

13. Plaintiff is a stockholder of Chipotle and has been a stockholder of Chipotle at all relevant times alleged in this Complaint.

14. Nominal defendant Chipotle is incorporated in the State of Delaware, and is headquartered at 1401 Wynkoop Street, Suite 500, Denver, Colorado 80202. Chipotle trades on the New York Stock Exchange under the ticker symbol "CMG."

15. Defendant Steve Ells ("Ells") founded Chipotle in 1993. Ells has served as a director of the Company since 1996 and the Chairman of the Board since 2005. He is the Company's chief executive officer ("CEO").

16. Defendant Montgomery F. Moran ("Moran") was a director of the Company from 2006 until December 9, 2016, and was the co-CEO, together with Defendant Ells, from January 1, 2009 until December 9, 2016. Moran served as Chipotle's President and Chief Operating Officer ("COO") from March 2005 until he was appointed co-CEO. Moran remains at the Company—in an undefined position—and plans to retire from the Company effective June 9, 2017.

17. Defendant Patrick J. Flynn ("Flynn") has been a director of the Company since 1998.

18. Defendant John S. Charlesworth ("Charlesworth") has been a director of the Company since 1999 and is a member of the Board's Audit Committee (the "Audit Committee").

19. Defendant Darlene J. Friedman ("Friedman") has been a director of the Company since 1995, with a brief hiatus between 1998 and 1999.

20. Defendant Albert S. Baldocchi ("Baldocchi") has been a director of the Company since 1997 and is Chairman of the Audit Committee.

21. Defendant Neil W. Flanzraich ("Flanzraich") has been a director of the Company since 2007.

22. Defendant Stephen Gillett ("Gillett") has been a director of the Company since March 12, 2015 and is a member of the Audit Committee.

23. Defendant Kimbal Musk ("Musk") has been a director of the Company since 2013.

24. The defendants named in paragraphs 15 through 23 above are referred to collectively as the "Defendants." Defendants comprised the Chipotle Board through the Company's 2015 outbreak crisis and until December 2016, when Moran stepped down from his position as a director and four new directors were appointed.

## SUBSTANTIVE ALLEGATIONS

### A. THE BOARD AND MANAGEMENT FAIL TO OVERSEE FOOD SAFETY COMPLIANCE

25. Founded by Defendant Ells in 1993, Chipotle operates a chain of restaurants that serve a focused menu of burritos, tacos, burrito bowls and salads, all of which are made using fresh ingredients. The Company brands itself as a healthy, fresh alternative to traditional fast-food

chains.[1] For many years, this strategy was successful and helped to propel the Company's rapid growth.

26. Chipotle's use of fresh ingredients, however, also increases the risk that its customers will experience food-borne illness. Indeed, it is well-established that the use of fresh ingredients poses a high risk of food-borne illness. According to a 2015 study published by the Center for Science in the Public Interest, fresh produce like cilantro and tomatoes—key ingredients in many of Chipotle's food offerings—cause more food-borne illness incidents than any other single category of food.[2]

27. Further, Chipotle's use of fresh produce, meat and chicken requires the Company to rely on numerous regional suppliers, necessitating a robust food safety and screening system. At least one restaurant industry periodical, *QSR* (Quick-Service and Fast Casual Restaurant News), has recognized that Chipotle's emphasis on using fresh ingredients belied a slew of operational challenges associated with its "labyrinth supply chain of small farms and suppliers." *QSR* has quoted Jeffrey Karrenbauer, president of supply chain consultancy Insight Inc., as stating:

> Obviously there's this great marketing appeal—freshness, local, organic—and you and I and the public don't tend to see that message and think, 'They've got a big management challenge.' There, the marketers may have won the challenge too quickly.

28. Prior to the highly-publicized 2015 outbreaks detailed below, the Company also experienced several other significant food-safety incidents. For example, in March and April of 2008, twenty Chipotle customers were sickened by an outbreak of hepatitis A traced to a Chipotle

---

[1] The Company's annual reports filed for each of the years ending 2012 through 2014 all note that Chipotle is "known for [its] focus on preparing food using a variety of fresh ingredients," and that the Company's food quality "depends" on the Company's ability to use fresh ingredients.

[2] *See* http://cspinet.org/reports/outbreak-alert-2015.pdf (last visited December 23, 2016).

restaurant in La Mesa, California. Also in April of 2008, more than 400 Chipotle customers were sickened by a Norovirus outbreak traced to a Chipotle restaurant in Kent, Ohio. Although the causes of the 2008 outbreaks were not conclusively determined, outbreaks of these illnesses are often caused by improper food handling.

29. Additionally, in February 2009, eleven Chipotle customers were sickened by a campylobacteriosis outbreak traced to a Chipotle restaurant in Apple Valley, Minnesota. The Minnesota Department of Health conducted an investigation into that outbreak and identified undercooking of chicken and the cross-contamination of fresh produce as its likely cause.

### 1. Chipotle's Growth Leads To Reduced Board And Management Oversight Over Food Safety Compliance

30. Chipotle has enjoyed rapid growth since its founding in 1993. At the time of the company's initial public offering ("IPO") in 2006, Chipotle operated approximately 500 restaurants.

31. Since the IPO, that number has nearly quadrupled. Chipotle operates approximately 1,971 restaurants throughout the United States, eleven restaurants in Canada, seven restaurants in England, four restaurants in France, and one restaurant in Germany. Chipotle operates and manages each restaurant itself—it does not franchise restaurants to third parties.

32. According to Chipotle's annual report for the fiscal year ending December 31, 2014 (the "2014 Annual Report"), which was filed with the SEC on February 4, 2015, Chipotle has undergone substantial growth and, as of the end of fiscal 2014, anticipated that it would continue growing: "We have grown substantially over the past five years, and expect to open between 190 and 205 additional restaurants in 2015…."

33. Notwithstanding Chipotle's rapid growth, the Defendants knowingly failed to honor their legal obligation to install adequate information and reporting systems that would provide them timely, accurate information concerning serious food safety incidents. Indeed, Defendants acknowledged as much in Chipotle's annual reports filed with the Securities and Exchange Commission ("SEC") in 2013 through 2015 (for fiscal years 2012 through 2014), disclosing that the Company's "existing restaurant management systems, financial and management controls, information systems and personnel ***may be inadequate to support our expansion***."[3] (emphasis added).

34. The Board's oversight over Chipotle's food safety controls was materially deficient. Tim Spong ("Spong"), Chipotle's Executive Director of Safety, Security and Risk, testified under oath in connection with a civil litigation matter that Chipotle's senior management was too "overwhelmed" to review food safety audit reports.[4] Spong, who created Chipotle's Safety Security and Risk ("SSR") audit program around 2007, testified that SSR audit reports were originally elevated "all the way up to the CEO,"[5] but that in late 2012 or early 2013, the Company "stopped escalating individual audits to officers due to their just being overwhelmed." Co-CEO Moran testified similarly, affirming in October 2014 that he had not seen an audit report "in a long time, and I think ***I might have been overwhelmed and not had them come to my screen directly***

[3] The annual reports were signed by each of the Defendants other than Gillet, who had yet to join the Board.

[4] September 18, 2014 Deposition of Tim Spong ("September Spong Deposition") at 83:20–22, 84:1–2.

[5] July 18, 2014 Deposition of Tim Spong ("July Spong Deposition") at 23:8–12.

***anymore***." Deposition of Montgomery Moran ("Moran Deposition") at 65:18–21 (emphasis added).[6]

35. REDACTED

a. REDACTED

b. REDACTED

c. REDACTED

d. REDACTED

e. REDACTED

f. REDACTED

---

[6] Not only were Chipotle officers not monitoring SSR audits, but the nature of the audits, according to Moran, "evolved" such that they became "more culturally focused." Moran Deposition at 42:2–4. REDACTED

### 2. Defendants Knowingly Failed To Monitor The Significant Food Safety Risks Arising From Chipotle's Scratch Cooking Initiative

36. REDACTED [redacted]

37. REDACTED [redacted]

38. REDACTED [redacted]

39. REDACTED [redacted] In the

Company's 2014 Annual Report on Form 10-K filed with the SEC February 4, 2015, Chipotle explained:

> We may be at a higher risk for food-borne illness outbreaks than some competitors due to our use of fresh produce and meats rather than frozen, and our reliance on employees cooking with traditional methods rather than automation.

40. REDACTED [redacted]

41. N REDACTED [redacted]

REDACTED [redacted]

42. REDACTED [redacted]

43. REDACTED [redacted]

REDACTED [redacted]

44. Even after the Simi Valley outbreak, the Board failed to implement ***any*** information or reporting systems to effectively monitor the safety of the Company's scratch cooking program.

45. Ultimately, Chipotle's shift to in-store produce preparation was blamed, at least in part, for the devastating outbreaks of 2015 (discussed below), prompting the Company to belatedly revert back to its central-commissary preparation process. In December 2015, after the outbreaks occurred, Ells would concede that the scratch cooking preparation method rendered it "impossible" to test every ingredient coming into each restaurant for the presence of harmful pathogens.

### B. CHIPOTLE EXPERIENCES WIDESPREAD FOOD-BORNE ILLNESS OUTBREAKS IN THE SUMMER OF 2015

46. In the summer of 2015, Chipotle's deficient food safety practices came to light in a disturbing and damaging way. As detailed below, over a several-month span, the Company experienced a multitude of confirmed food-borne illness outbreaks traced to Chipotle restaurants across the nation.

#### JULY 2015 E. COLI OUTBREAK IN WASHINGTON STATE

47. According to James Apa ("Apa"), the communications director for Seattle & King County Public Health, in late July 2015, officials in his agency traced fives cases of E. coli O157:H7 infection to a Chipotle restaurant in Seattle, Washington. According to Apa, Chipotle and the Centers for Disease Control ("CDC") were aware of the outbreak. Yet, the Company never publicly disclosed the outbreak, which was revealed in the press months later.

48. The source of the outbreak was never conclusively determined. However, E. coli is most commonly transmitted by consumption of raw food or water contaminated with human or animal feces. Raw meat, poultry, dairy or eggs are the most common sources for E. coli outbreaks in the United States.

49. To prevent transfer of E. coli, restaurants must take adequate precautions to ensure that the food products they use are properly tested for harmful bacteria. Moreover, restaurant employees need to ensure that they maintain and follow proper food safety procedures, including, among other things, (a) washing their hands with soap after using the bathroom, (b) washing their hands after handling raw food products, (c) cleaning surfaces used to prepare raw food products, and (d) cleaning utensils and other equipment used to prepare raw food products.

50. Failure to follow these basic procedures can cause significant harm to restaurant patrons. E. coli O157:H7 can cause severe stomach pain, diarrhea (often bloody), and vomiting. Some infections are mild. Other infections, however, can cause severe disease resulting in kidney failure and even death. In 1993, an outbreak of E. coli O157:H7 that was traced to several Jack in the Box restaurants infected hundreds of patrons, killing four children and seriously harming another 178 individuals.

**AUGUST 2015 NOROVIRUS OUTBREAK IN WASHINGTON STATE**

51. In August 2015, another food-borne illness outbreak was traced to a Chipotle restaurant in Washington State. This outbreak involved Norovirus.

52. Norovirus may be transmitted by consuming contaminated food or water, or by touching surfaces contaminated with the virus. Norovirus causes acute inflammation of the stomach and intestines. Symptoms include nausea, vomiting, diarrhea, abdominal pain, headache and low-grade fever. Symptoms may be mild in healthy individuals, but infections can become

far more serious—and potentially fatal—in children, the elderly and immuno-compromised persons. According to the CDC, Norovirus causes 570–800 deaths each year in the United States.

53. The Washington State Department of Health investigated the outbreak and discovered that a Chipotle employee was told to report to work despite feeling ill. The employee worked four hours and vomited in the restaurant. Public health officials concluded that this event was "one of the proverbial smoking guns for this outbreak."

54. REDACTED [redacted]

**AUGUST 2015 NOROVIRUS OUTBREAK IN SIMI VALLEY, CALIFORNIA**

55. On August 18, 2015, another serious Norovirus outbreak occurred at a Chipotle restaurant in Simi Valley, California. At least 234 Chipotle customers and employees fell ill,

suffering headaches, fever, stomach pain, vomiting and diarrhea. Some of those infected with the virus were hospitalized.

56. Chipotle was first notified of the outbreak on August 20, 2015. According to an October 28, 2015 internal memorandum (the "Health Division Memo") authored by an official with the Ventura County Environmental Health Division (the "Ventura County EHD"), on the evening of August 20, 2015, Chipotle's "CEO Office" received an email from the parent of a Chipotle customer who, along with a group of sixteen other students, allegedly fell ill after eating at the Simi Valley restaurant. The email also stated that one of the students had been hospitalized. According to an August 24, 2015 food inspection report authored by an investigator with the Ventura County EHD, Chipotle's corporate office was also notified "that a highly susceptible population of seventeen children from Grace Brethren School in Simi Valley was among" those infected with the food-borne illness. As previously explained, Norovirus infections in children can cause serious injury and even death.

57. Also on August 20, Chipotle employees, following the Norwalk Protocol, closed the Simi Valley restaurant, bleached the facility, and discarded all food. Chipotle did not, however, notify the public or its customers who had visited the Simi Valley restaurant and were or may have been exposed to the Norovirus. In fact, the Company sought to conceal the outbreak from its customers, posting a sign on the restaurant's entrance explaining that it had been closed "due to a severe staffing issue." There is also no evidence to suggest that Chipotle even attempted to determine either the source of the outbreak or the pathogen that caused it (*e.g.*, E. coli, Norovirus, etc.) before bleaching the restaurant and discarding all evidence. In a class action complaint filed against Chipotle in California federal court, patrons of the Simi Valley restaurant who contracted

the Norovirus alleged that they visited the Simi Valley restaurant on August 20 to complain that they had become sick after eating food purchased at the restaurant. According to the complaint, Chipotle's area manager falsely told the customers that there was no issue with the food and provided them a coupon for a free entrée.

58. That Chipotle made a concerted effort to conceal the Simi Valley outbreak is not surprising because the Company was simultaneously confronting food-borne illness outbreaks in the state of Washington (discussed above) and in Minnesota (discussed below).

59. After the Simi Valley Chipotle restaurant had been bleached and its employees temporarily replaced, Chipotle reopened the restaurant on August 21, 2015.

60. According to the Health Division Memo, on Saturday August 22, 2015, the "Chipotle corporate office" left a voicemail message with the Ventura County EHD, explaining that the Simi Valley restaurant had seventeen sick employees, who had been replaced with temporary staffing.

61. Also on August 22, CBS Los Angeles reported on the outbreak.[7] In response to the media coverage, Chipotle issued the following official statement:

> The safety and well-being of our customers is always our highest priority. When we were contacted by customers who reported feeling poorly after visiting our restaurant in Simi Valley, we immediately began a review of the incident, and have taken all of the necessary steps to ensure that it is safe to eat there.[8]

62. On August 24, 2015, Mike Byrne ("Byrne"), on behalf of the Ventura County EHD, contacted Chipotle's corporate office. Byrne spoke to Roslyn Stone ("Stone"), who, upon information and belief, is Chipotle's Executive Director of Supply Chain and Safety. Stone

[7] http://losangeles.cbslocal.com/2015/08/22/dozens-fall-ill-after-eating-at-simi-valley-chipotle/

[8] *Id.*

informed Byrne that Chipotle had been receiving complaints from customers over the past few days and provided Byrne a list of seventeen ill employees and 74 ill customers. Stone also informed Byrne that the Simi Valley restaurant had reopened after it had been "thoroughly cleaned and sanitized and all food items were destroyed."

63. On August 24, 2015, Ventura County EHD public health officials conducted an inspection of the Simi Valley restaurant. Despite the fact that the Simi Valley restaurant had already employed the Company's Norwalk Protocol, health officials discovered multiple violations of the California Retail Food Facilities Law and The Sherman Food and Drug Law, including:

a. Food handlers did not possess a valid food handler certification card;

b. Flying insects were observed within the food facility;

c. Equipment was not clean, including an ice machine containing mildew and a deep fryer containing an accumulation of grease and food debris;

d. Floors, walls and ceiling were in an "unsanitary condition";

e. Restroom was "unclean or in disrepair"; and

f. Drain line from the customer self-service soda fountain was directly connected to the sewer.

64. Ventura County EHD investigators, however, could not perform routine testing because Chipotle had already instituted its Norwalk Protocol, hampering officials' efforts to determine the source of the outbreak and the pathogen that caused it. Indeed, on September 8, 2015, an official with the Ventura County EHD noted the following in an internal email communication:

> ***Chipotle has an inadequate employee health protocol and failed to report to us in a timely manner*** (more than 5–6 days) despite many employees reported ill at work.

> They then subsequently closed voluntarily and disposed of all the food items and super sanitized the facility. ***By the time we were aware of the outbreak, there was nothing left for us to sample. The corporate office was not cooperating which made it more complicated.***

65. Another official with the same agency similarly lamented:

> ***We believe [Chipotle] should have notified us sooner, not late in the game.*** Because they had already shut the restaurant down, thrown out all the food, completely cleaned the place up, went top to bottom with bleach, and brought in a new staff, ***we didn't have any opportunity to sample food or do some of the things we normally do to investigate a foodborne outbreak.***
>
> * * *
>
> [We don't] know exactly what the restaurant did between the 18th and the 21st as far as who they knew was sick on their staff, did they send them home, did they keep them there? ***Had we known earlier, we potentially could have prevented more people from getting sick.***

66. On August 25, 2015, NBC Los Angeles reported on the outbreak and the aforementioned violations discovered by Ventura County health inspectors. The news segment painted a disturbing picture, noting that it was important for restaurant employees to have valid food handler certification cards because they guarantee the employees have sufficient training to prevent food-borne illness. Asked by NBC to comment on the outbreak, Chipotle provided a statement identical to the one it provided in response to the CBS report days earlier.

67. The NBC segment also reported that the Simi Valley restaurant had a record of food safety violations dating back to January 2015. Indeed, the restaurant was a habitual violator. In the months preceding the Norovirus outbreak, Ventura County EHD inspectors discovered the following violations:[9]

- January 8, 2015 (routine inspection):

---

[9] A history of the Simi Valley restaurant's violations are available online: http://www.decadeonline.com/insp.phtml?agency=VEN&record_id=PR0028081

    - "Flying insects observed within the food facility."
    - "Soiled, unsanitary wiping cloth(s) are used to wipe food preparation equipment and/or food contact surfaces."
    - "Equipment is connected directly to the sewer."
    - "Plumbing fixtures are leaking or in disrepair."
    - "The floor is deteriorated and/or damaged and no longer smooth, durable and easily cleanable."

- January 27, 2015 (follow-up inspection):
    - "Violations observed on previous inspections have not been corrected."
    - "Flying insects observed within the food facility."
    - "Equipment is connected directly to the sewer."

- May 21, 2015 (routine inspection):
    - "The restroom is unclean or in disrepair."
    - "Flying insects observed within the food facility."
    - "Equipment and utensils are not maintained clean, fully operative and in good repair."
    - "The floor is deteriorated and/or damaged and no longer smooth, durable and easily cleanable."
    - "The premises and/or floors, walls, or ceiling are in an unsanitary condition."

- June 8, 2015 (routine inspection):
    - "The restroom is unclean or in disrepair."
    - "The floor is deteriorated and/or damaged and no longer smooth, durable and easily cleanable."

- "Flying insects observed within the food facility."
- "A 3/8 inch covered base is not provided at the floor/wall juncture."
- "Violations observed on previous inspections have not been corrected."

68. The Simi Valley restaurant also had numerous violations in 2014. During ***all five*** routine or follow-up inspections conducted that year, inspectors observed flying insects in the restaurant. ***Three times*** that year health inspectors recorded a violation because the restaurant did not have "documentation . . . to verify that the owner or a food employee of the facility has successfully passed an accredited food protection manager certification examination." Among other things, inspectors also observed: "equipment or utensils are not clean, fully operative and in good repair" (9/15/14); "the refrigeration unit used for storage of potentially hazardous food is maintained above 41 degrees Fahrenheit" (7/14/14 and 1/28/14); "the premises and/or floors, walls, or ceiling are in an unsanitary condition" (1/28/14); "wall and/or ceiling surfaces are deteriorated and/or damaged" (9/15/14); "The outside refuse area is not maintained in a clean, sanitary condition and free of accumulated waste and debris. The refuse containers are not maintained closed" (1/28/14 and 9/15/14); "multi-use utensils and/or equipment are not sanitized" (1/28/14); "equipment is unclean and maintained in an unsanitary condition" (1/28/14); "clean equipment, utensils, laundered linens, and single-use articles are subject to contamination or are stored directly on the floor" (1/28/14); "employee food and beverages are stored in food preparation, utensil, or retail food areas" (1/28/14); "equipment is connected directly to the sewer" (1/28/14); "food is stored in an unapproved area" (1/28/14); "soiled, unsanitary wiping cloth(s) are used to wipe food preparation equipment and/or food contact surfaces" (1/28/14); "the sanitizing solution for storage of wiping cloths used repeatedly to wipe food contact surfaces is not

maintained at the required concentration" (7/14/14 and 9/15/14); and "a utensil without a handle is used to dispense food" (7/14/14).

69. On August 27, 2015, Ventura County health inspectors returned to the Simi Valley Chipotle location and discovered additional violations, including maintaining beef at a dangerous, 118-degree Fahrenheit temperature for an extended period of time. The investigator recorded this as a "Major Violation." On September 17, 2015, Ventura County health inspectors returned to the restaurant and discovered another violation—an employee's cellular phone sitting "directly on food preparation tables."

70. From its investigation, the Ventura County EHD concluded that 234 customers and employees of the Simi Valley Chipotle restaurant had fallen ill as a result of Norovirus, but also concluded that "the actual number of customers and employees ill from this outbreak is likely to be substantially higher." On September 3, 2015, the Ventura County EHD issued a press release announcing the findings from its investigation into the Simi Valley outbreak.

71. In the week following the outbreak, Chipotle's stock fell by roughly $50 per share, representing an approximately 7% decrease. The outbreak and resultant stock drop received widespread media attention, including articles in *Los Angeles Magazine*, *The Los Angeles Times* and CBS News.[10]

[10] *See*, *e.g.*, August 22, 2015 CBS Los Angeles "Dozens Fall Ill After Eating At Simi Valley Chipotle" (http://losangeles.cbslocal.com/2015/08/22/dozens-fall-ill-after-eating-at-simi-valley-chipotle/); August 28, 2015 *Los Angeles Magazine* "99 People Got Sick from a Simi Valley Chipotle: Here's What You Need to Know" (http://www.lamag.com/digestblog/99-people-got-sick-from-a-simi-valley-chipotle-heres-what-you-need-to-know/); September 4, 2015 *The Los Angeles Times* "Norovirus caused illness outbreak at Ventura Chipotle restaurant, officials say" (http://www.latimes.com/local/lanow/la-me-ln-norovirus-chipotle-simi-valley-illness-20150904-story.html).

72. On January 6, 2016, Chipotle filed a Form 8-K with the SEC disclosing that the Simi Valley outbreak was under federal investigation:

> In December 2015, Chipotle was served with a Federal Grand Jury Subpoena from the U.S. District Court for the Central District of California in connection with an official criminal investigation being conducted by the U.S. Attorney's Office for the Central District of California, in conjunction with the U.S. Food and Drug Administration's Office of Criminal Investigations. The subpoena requires us to produce a broad range of documents related to a Chipotle restaurant in Simi Valley, California, that experienced an isolated norovirus incident during August 2015. We intend to fully cooperate in the investigation. It is not possible at this time to determine whether we will incur, or to reasonably estimate the amount of, any fines, penalties or further liabilities in connection with the investigation pursuant to which the subpoena was issued.

73. Following this disclosure, the price of Chipotle's common stock dropped by $22 per share. Thirteen days later, Chipotle was named as a defendant in a putative class action filed in California federal court (*H.C.L. et al. v. Chipotle Mexican Grill Inc.*, No. 2:16-cv-399 (C.D. Cal.)) by Chipotle customers harmed as a result of the Norovirus outbreak. Chipotle settled claims asserted by the named plaintiffs for an undisclosed amount. DI's 69–70.

74. The Norovirus outbreak at the Simi Valley Chipotle location apparently did not cause Chipotle or the Board to remedy the Company's food safety practices and, as a result, was not an isolated incident.

## AUGUST 2015 SALMONELLA OUTBREAK THROUGHOUT MINNESOTA

75. While the Company was busy responding to the Simi Valley outbreak, it was simultaneously dealing with a Salmonella outbreak emerging in Minnesota, which infected 64 individuals. The Minnesota Department of Health eventually traced the outbreak to meals served at twenty-two Chipotle restaurants throughout Minnesota from August 16 to August 28, 2015.

76. Salmonella is an enteric bacterium, which means that it lives in the intestinal tracts of humans and other animals. Salmonella and E. coli bacteria are transmitted by similar means.

Humans typically contract Salmonella by consuming food contaminated with animal feces or foods that have been handled by infected food service workers who fail to maintain proper hygiene. Salmonella bacteria, however, is killed when contaminated food is thoroughly cooked.

77. By September 3, 2015, officials with the Minnesota Department of Health informed Chipotle corporate employees of the Salmonella outbreak, including Patti Mann ("Mann"), Chipotle's Investigations Manager. According to sworn testimony given by Chipotle's Executive Director of Safety, Security and Risk (*i.e.*, Spong),[11] Mann reports to him and Spong reports directly to CFO Hartung.[12] Moran testified in deposition that Spong reports to him. According to a former Chipotle employee who assisted lead plaintiffs' investigation in the federal securities litigation against Moran and Ells, and who reported directly to Spong, Moran and Spong are "incredibly" close and "there is absolutely no reason why [] Moran would not have known about [the Salmonella outbreak] because [] [Spong] would have spoken to him directly about it, just from the nature of their relationship."

78. Spong and Mann were copied on a September 9, 2015 email to Minnesota health officials, stating that Heidi Wederquist ("Wederquist"), Chipotle's Director of Quality Assurance & Food Safety, had identified tomatoes from a produce supplier as the source of the outbreak. Upon information and belief, Wederquist reported directly to Jason Von Rohr, Chipotle's Supply

---

[11] Spong's connection to Chipotle began in 1992 when he was hired by Ells to represent him in a personal injury action. Ells subsequently hired Spong to serve as the Company's outside counsel, a role he held from 1992 through 1998. In September 2006, Spong was hired by Chipotle to serve as its Director of Safety, Security and Risk. In February 2013, Spong was promoted to Executive Director of Safety, Security, and Risk.

[12] July Spong Deposition at 14:3-20.

Chain Executive Director, who, according to Moran's sworn testimony, reported directly to Moran.

79. On September 10, 2015, the Minnesota Department of Health issued a press release announcing that forty-five reported cases of Salmonella infection had been linked to more than a dozen Chipotle restaurants throughout the State. The press release stated that Chipotle had changed the source of the suspected produce item under investigation.

80. On September 11, 2015, Wederquist emailed Dana Eikmeier, an epidemiologist with the Minnesota Department of Health, acknowledging that the Salmonella outbreak had spread to include 58 individuals linked to more than twenty-one Chipotle restaurants.

81. That same day, a personal injury action (*Beck v. Chipotle Mexican Grill, Inc.*, No. 15-cv-3648 (D. Minn.)) was filed against Chipotle in the United States District Court for the District of Minnesota by an individual who allegedly contracted Salmonella by eating a meal at a Chipotle restaurant. The plaintiff in that case alleged that she was admitted to the hospital on two occasions to treat her illness and suffered from various complications, including blood clots in both arms. Chipotle was served with the complaint in the *Beck* action on September 29, 2015. Chipotle later settled the action for an amount that was not publicly disclosed.

82. Another personal injury claim (*Mohawk v. Chipotle Mexican Grill, Inc.*, No. 15-cv-3681 (D. Minn.)) was filed by a Chipotle customer on September 16, 2015, alleging injuries related to a confirmed case of Salmonella. Chipotle was served with the complaint on September 29, 2015. Upon information and belief, Chipotle also settled this action for an amount that has not been publicly disclosed.

83. On September 16, 2015, Doug Shultz of the Minnesota Department of Health informed Chipotle's Public Relations Director Chris Arnold that the Minnesota Department of Health was set to issue a press release to update the public on the investigation. In an exchange of emails with Shultz, Arnold complained that another release was unnecessary given that the September 10 press release had "generated more than 200 stories all over the country." Nevertheless, that day the Minnesota Department of Health announced that the Salmonella outbreak had been traced to tomatoes used at Minnesota Chipotle restaurants. The press release also stated that there had been 64 reported cases associated with twenty-two Chipotle locations across the state, and that nine Chipotle customers had been hospitalized.

84. Over the next month, three more personal injury suits were filed by Chipotle customers alleging damages caused by Salmonella they contracted at the Company's restaurants in Minnesota.

85. News of the outbreaks in Minnesota and Simi Valley hit Chipotle hard. Between the market's open on August 18, 2015 and its close on September 29, 2015, Chipotle's stock price declined by $45.71—more than 6%.

### E. DURING THEIR AUGUST AND SEPTEMBER BOARD AND AUDIT COMMITTEE MEETINGS, THE DEFENDANTS CONSCIOUSLY DISREGARD CLEAR RED FLAGS THAT WARN OF PERVASIVE FOOD SAFETY PROBLEMS

86. REDACTED

[redacted]

REDACTED [redacted]

87. REDACTED [redacted] [13] REDACTED [redacted]

88. REDACTED [redacted]

89. REDACTED [redacted]

---

[13] REDACTED [redacted]

REDACTED [redacted]

90. Despite these repeated and clear warnings that a major acknowledged risk to the Company was being compounded by remediable failures at the restaurant level, the Board took no affirmative action until the risks had already manifested with disastrous—and likely irreversible—consequences.

91. REDACTED [redacted]

92. REDACTED [redacted]

**E. THE DEFENDANTS' DECISIONS TO REPEATEDLY IGNORE WARNINGS OF INTERNAL FOOD SAFETY DEFICIENCIES ALLOW ADDITIONAL FOOD-BORNE ILLNESS OUTBREAKS TO MATERIALIZE IN THE FALL OF 2015**

**OCTOBER 2015 E. COLI OUTBREAK IN WASHINGTON, OREGON, CALIFORNIA, NEW YORK, OHIO AND MINNESOTA**

93. On October 30, 2015, Washington State Department of Health officials contacted Mann and Wederquist to report an outbreak of E. coli STEC 026 that began on October 17, 2015 and was linked to Chipotle restaurants in Washington and Oregon. The following day, Chipotle

closed 43 restaurants located within those two states. According to a federal securities fraud complaint filed against Moran and Ells on June 17, 2016 in *Susie Ong, et al. v. Chipotle Mexican Grill, Inc., M. Steven Ells, Montgomery F. Moran, and John R. Hartung*, C.A. No. 1:16-cv-00141-KPF (SDNY) (the "Securities Complaint"), internal emails between officials at the Washington State Department of Health from October 31, 2015 indicate that Chipotle would have been forced to close these restaurants had the Company not done so voluntarily.

94. By November 1, 2015, media outlets began reporting on the outbreak. By November 2, 2015, analyst reports—including those issued by Matthew Difrisco and Matthew Kirschner of Guggenheim; Karen Short and Bret Levy of Deutsche Bank; David Palmer of RBC Capital Markets; and Jake Bartlett of SunTrust Robinson Humphrey—noted that this E. coli outbreak was yet another food-borne illness outbreak experienced by Chipotle in recent months, and listed the August 2015 Salmonella outbreak and the August 2015 Norovirus outbreak in California as other examples.

95. On November 2, 2015, Spong and Wederquist participated in a call with officials from the Washington Department of Health, the U.S. Food and Drug Administration ("FDA"), and the CDC. The call concerned the recent outbreak in Washington and Oregon. During this call, the CDC disclosed to Spong and Wederquist that it was "working hard" to determine the extent of the outbreak.

96. On November 3, 2015, the Oregon Health Authority issued a press release, announcing that (a) a total of twelve cases of E. coli had been linked to Chipotle restaurants; (b) three patrons had been hospitalized; (c) the outbreak covered six counties; (d) the number of infected patrons "is likely more than identified" since many people may not seek medical attention;

and (e) the Oregon Health Authority, Washington State Department of Health, the FDA and the CDC were working with local health departments on the outbreak investigation.[14]

97. On November 3, 2015, Chipotle issued a press release in which Ells apologized to customers, but assured them that "[t]he safety of our customers and integrity of our food supply has always been our highest priority."[15] The press release also states the Company had "fully" cooperated with public health investigators.

98. On November 4, 2015, the CDC provided an update on the status of its investigation into the outbreak, stating that 39 individuals had been infected and that the "CDC and state and local public health partners are continuing laboratory surveillance through PulseNet to identify additional ill persons and to interview them. Updates will be provided when more information is available." The following day, the CDC provided another update, announcing that the number of infected customers was now at 40 and that it was "continuing laboratory surveillance … to identify additional ill persons and to interview them." The CDC provided similar updates on November 6 and 9, increasing the total number of infected patrons to 41. On November 12, the CDC's status update disclosed that 51 people were reported ill in Washington and Oregon and that its investigation was ongoing.

99. On November 9, 2015, the Washington Department of Health announced publicly that its investigation into the outbreak was ongoing, and that ten individuals had been hospitalized in Washington.

---

[14] http://www.oregon.gov/oha/news/Pages/Oregon%20cases%20of%20E.%20coli%20linked%20to%20Chipotle%20now%20at%2012.aspx

[15] *See* http://www.cnn.com/2015/11/01/health/chipotle-closings-e-coli-scare/

100. On November 4, 2015, a Food Safety Program Supervisor with the Washington State Department of Health advised Mann that Chipotle was required to revise its produce rinsing procedures before it could reopen any of its restaurants in Washington. That very same day, Chipotle agreed to do so. According to the Securities Complaint, during a November 6, 2015 telephone call, Spong, Wederquist and Washington State Department of Health officials discussed "using new methods of [sic] clean, rinse, and sanitize as well as produce rinsing procedures."

101. On November 20, 2015, the CDC provided a further update, this time disclosing that that the E. coli outbreak in Washington and Oregon had been linked to outbreaks at Chipotle restaurants in California, New York, Ohio and Minnesota. The CDC also cautioned that its investigation was "ongoing," and that it had not yet identified the food source linked to the outbreak.

102. In an attempt to mislead the public, regulators and investors, Chipotle issued its own press release on November 20, 2015, stating that "health officials have concluded that there is no ongoing risk." In the press release, Ells is quoted as follows: "We take this incident very seriously because the safety of our food and wellbeing of our customers is always our highest priority."

103. On December 4, 2015, the CDC provided another update, reporting that seven additional individuals, located in multiple states including California, Illinois, Maryland, Ohio, Pennsylvania, and Washington, had been reported ill. The CDC also disclosed that these incidents, as confirmed by laboratory testing, were related to the outbreak in Oregon and Washington.

## NOVEMBER 2015 E. COLI OUTBREAK IN KANSAS AND OKLAHOMA

104. Another E. coli outbreak that began on November 18, 2015, was traced to Chipotle restaurants in Kansas and Oklahoma. The DNA of this STEC 026 strain differed from that of the

previous outbreak. Five customers reported illness, which came to the attention of the CDC by November 26, 2015. According to the Securities Complaint, Chipotle was aware of this outbreak no later than November 26. The CDC disclosed its investigation into this outbreak on December 21, 2015.

**DECEMBER 2015 NOROVIRUS OUTBREAK IN MASSACHUSETTS**

105. On December 7, 2015, 143 Chipotle customers in Massachusetts became ill. It was later determined that a sick employee reported to work at a Chipotle restaurant located in Brighton, Massachusetts, triggering yet another Chipotle-based Norovirus outbreak.

106. The restaurant was closed from December 7 through December 9. The restaurant was subsequently cited for two health violations: improper handling of poultry and the presence of a sick employee.

107. On December 8, 2015, *The New York Times* published an article entitled "Chipotle's Safety Woes Worsen as Scores of Students Fall Ill in Boston." The *New York Times* article reported that Chipotle might be forced to raise prices to cover the costs of an enhanced food safety program and lost business because of closed stores and slumping sales.

108. On December 9, 2015, *The Washington Post* published an article entitled "There's a crisis at Chipotle." The article reported that "Chipotle's reputation is perhaps more at risk than most in the fast-food industry because the chain has promised that it adheres to more-rigorous standards for procuring and serving its food." The same day, *The Washington Post* also ran an article entitled "What in the world is happening to Chipotle." The article noted that the food scare jeopardized Chipotle's reputation as a purveyor of high-quality food, which had previously helped "propel the brand." The article also noted similar problems that could surface as the chain continued to expand.

109. On December 11, 2015, *Fortune* published an article entitled "Chipotle's E. Coli Fiasco Teaches Us How Not To Respond to a Crisis." The article explained how Moran demonstrated poor crisis leadership and seemed to blame the CDC and the media for the depth and severity of the Company's crisis.

110. On December 21, 2015, *USA Today* published an article entitled "Chipotle drops 5% as second E. Coli outbreak eyed." The article reported that the CDC was investigating an outbreak of a different DNA fingerprint of Shiga toxin-producing E. coli that had sickened five people in North Dakota, Kansas and Oklahoma between November 18 and November 26, 2015, all five of whom had eaten at Chipotle. The article also noted the massive loss in the value of Chipotle stock in the wake of the latest illness outbreak.

111. On December 22, 2015, *The New York Times* reported on Chipotle's various food-borne illness outbreaks. The article quoted Dr. Ian Williams, Chief of the Outbreak Response and Prevention Branch of the CDC, as stating that one of the challenges facing the CDC's investigation was that Chipotle's recordkeeping system prevented the CDC from ascertaining the commonalities among food served across the affected restaurants. Clearly, these systemic deficiencies would have also impaired Chipotle's own ability to investigate and respond to food-borne illness outbreaks tied to its restaurants.

112. REDACTED [redacted]

REDACTED [redacted]

[redacted]

113. REDACTED [redacted]

[redacted]

114. REDACTED [redacted]

115. REDACTED [redacted]

**F. CHIPOTLE RETREATS TO CENTRAL-COMMISSARY PRODUCE PREPARATION IN THE WAKE OF ITS FOOD-SAFETY CRISIS**

116. On December 8, 2015, Defendants Ells and Moran presented at the Sanford C. Bernstein Consumer Summit, where they announced that Chipotle was in the process of implementing reforms intended to stem the tide of food-borne illness outbreaks afflicting the Company's restaurants. Specifically, they announced that Chipotle was retreating to central-commissary preparation for certain produce items in order to facilitate new "high-resolution" testing procedures to evaluate the safety of ingredients prior to their delivery to Chipotle

restaurants. Ells explained that the Company had moved to "dicing our tomatoes in a commissary, so that they could go through a sanitizing kill step and then [be] hermetically sealed in containers and delivered to restaurants" and that the Company had implemented a "similar protocol for cilantro." Moran added that Chipotle had also moved to centralized preparation of the Company's romaine lettuce so that it is "brought into our restaurants having been already washed and tested."

117. Shortly thereafter, on December 16, 2015, Defendants Ells and Moran were interviewed by CNBC's Jim Cramer concerning the Company's efforts to avoid future food-borne illness outbreaks and again indicated that Chipotle had initiated a move back to central-commissary preparation for at least some ingredients. Ells stated, "We're still doing many, many, many things in house…It's just that the testing of tomatoes, for instance, would not be possible. We couldn't do this high-resolution testing in restaurants right now. And we wanted to ensure that we are the safest place to eat." Ells further explained that the Company's reforms "brings the risk of contamination in [a] tomato, for example, to near zero when we do it in the central commissary."

118. A press release subsequently issued by the Company on January 19, 2016 indicates that cheese shredding was also among the processes centralized in the wake of the Company's food-safety crisis. That release, in pertinent part, states that Chipotle had implemented "changes to food prep and food handling practices, including washing and cutting of some produce items (such as tomatoes and romaine lettuce) and shredding cheese in central kitchens."

119. Chipotle's February 5, 2016 annual report on Form 10-K formally reported that the Company had implemented a new food safety program, components of which include, *inter alia*, "DNA-based testing of many ingredients designed to ensure the quality and safety of ingredients before they are shipped to our restaurants" and "changes to food preparation and food handling

practices, including washing and cutting some produce items (such as tomatoes and romaine lettuce) in central kitchens…"

120. Although Chipotle has not disclosed the full set of reforms implemented in the wake of its food-safety crisis, it is clear that its reforms involved a significant retreat from the "scratch cooking" initiative in favor of centralized preparation of many ingredients.

121. Further, certain reforms have had to be abandoned or modified in an effort to preserve sales.[16] Because many reactionary practices were hastily implemented without proper planning, the Company has struggled to find a balance between its approach to fresh ingredients and its food safety protocol.

### G. THE MASSIVE FALLOUT FROM DEFENDANTS' FAILURE TO ACT IN THE FACE OF SUBSTANTIAL, KNOWN RISKS

122. REDACTED [redacted]

Historically, Chipotle had consistently delivered excellent same-store sales performances over time. That changed dramatically following the flood of negative publicity resulting from Chipotle's food safety issues. Whereas Chipotle was once perceived as offering responsibly-prepared and healthy food, the E. coli, Norovirus and Salmonella outbreaks neutralized this

[16] For example, Chipotle has gone back to having staff dice lettuce in each restaurant because, when performed at a central commissary, the precautionary step of removing the outer layer of romaine lettuce led Chipotle customers to believe the Company had switched to using cheaper iceberg lettuce.

primary asset for achieving excellent same-store sales. Consequently, Chipotle's stock has suffered tremendously, seeing its upward momentum reversed and years of Wall Street and Main Street goodwill destroyed. Further, the Company has been forced to undergo a massive overhaul, both in terms of its marketing strategy and its operations. While these endeavors have been costly, they have also been of minimal remedial effect as explained below.

123. A January 5, 2016 *NPR* report quoted professor John Stanton from St. Joseph's University in Philadelphia, who explained that the damage to Chipotle's brand was particularly severe because the Company's food-safety issues amounted to a sort of betrayal of consumers. Chipotle, he explained, "kind of positioned themselves as a special company that caters to the fresh and delicious product … and they've let people down." In response to a December 10, 2015 statement by Defendant Ells that Chipotle would install heightened food-safety procedures, Professor Stanton insightfully asked, "why didn't they do that originally? I mean, they obviously weren't doing all they could to make their products safe, and they're now paying a price for it." The same *NPR* report also quoted Timothy Calkins, a professor from Northwestern University's Kellogg School of Management, who highlighted the damage caused by Defendants' failures to act quickly in response to the early outbreaks in summer 2015. "The difficult thing for Chipotle," he explained, "is that it's not that there was one incident. There have been a number of incidents." "And the problem with that," he continued, "is that it creates an overall perception, and it raises questions about safety."

124. Other commentators echoed the sentiments expressed by Professors Stanton and Calkins. *The Guardian*, for example, reported that "Industry experts reckon Chipotle will find it harder to bounce back than other fast food restaurants because it has put so much emphasis on the

quality, freshness and healthiness of its food." On January 6, 2016, *The Washington Post* reported the series of revelations about food-borne illness connected to the Company as a "seemingly endless string of sour news" that "is taking its toll." The article stated plainly that the residual effect of the Company's health and safety failures "bodes poorly for the months and quarters to come."

125. Regarding the various outbreaks, *QSR* quoted Francine Shaw, President of Food Safety Training Solutions, who recognized that the pattern of illness outbreaks reflected a systemic issue within the Company:

> Given the fact that they had multiple foodborne illness outbreaks in such a short timeframe, a lot went wrong . . . , I think more than likely the crux of the issue is that at on some level there was a lack of training across the board. Because it wasn't at just one location.

126. In the same interview, Shaw identified the spread of Norovirus as especially egregious given how easy it is to combat, and suggested that the Norovirus outbreaks had resulted from basic and fundamental failures of oversight:

> That's training people not to come to work when they're sick, to wash their hands. Those are just the very basics. I think Chipotle got so focused with the "Food With Integrity" campaign that they lost track of food safety in general.

127. The significant negative publicity caused by the Company's food-safety crisis has had a severe, tangible and lasting adverse impact on Company sales and profitability. On February 2, 2016, the Company issued a press release announcing earnings and other financial results for its fiscal quarter and year ended December 31, 2015. The news was bleak. For the fourth quarter of 2015, revenue decreased 6.8% to $997.5 million, comparable restaurant sales decreased 14.6%, net income decreased 44.0% and diluted earnings per share decreased 43.5% as compared to the fourth quarter of 2014. As Defendant Ells conceded in a February 2, 2016 press release

accompanying those startling results, "the fourth quarter of 2015 was the most challenging period in Chipotle's history."

128. REDACTED [redacted]

129. REDACTED [redacted]

130. REDACTED [redacted]

131. REDACTED [redacted]

REDACTED [redacted]

132. On April 26, 2016, Chipotle reported predictably abysmal financial results for the first quarter of 2016. Lowlights of the first quarter of 2016 compared to the first quarter of 2015 include the following:

a. Revenue decreased 23.5%;

b. Comparable restaurant sales decreased 29.7%

c. Comparable restaurant transactions decreased 21.1%

d. Restaurant level operating margin was 6.8%, a decrease from 27.5%;

e. Net loss was $26.4 million, a decrease from net income of $122.6 million; and

f. Diluted loss per share was $0.88, a decrease from diluted earnings per share of $3.88.

133. Commenting on the poor results, Ells conceded that Chipotle sales were merely on a "gradual path to recovery."

134. The Company's and the Defendants' belated attempts to address the risks of food-borne illness *ex post* have failed to prevent the Company's financial deterioration. For example, on or around June 9, 2016, *The Harris Poll*—in which over 97,000 U.S. consumers assessed more than 3,800 brands—named Moe's Southwest Grill ("Moe's") as the most popular fast casual Mexican restaurant in the United States, dethroning Chipotle, which had previously held the

number one ranking. Indeed, Chipotle's brand also fell below Taco Bell, Qdoba Mexican Grill and Baja Fresh Mexican Grill.

135. On June 22, 2016, *Eater*, a media brand dedicated to culinary news, reported that "Customer satisfaction in [Chipotle] continues to plummet" in an article titled "Consumers Are Deeply Unsatisfied With Chipotle" that detailed the Company's drop in the American Consumer Satisfaction Index.

136. On July 21, 2016, Chipotle reported financial results for the second quarter of 2016. As was the case for its first quarter results, Chipotle's second quarter results were abysmal, showing net income down 87 cents a share and same-store sales down 23.6%, missing analysts' estimates in both regards. As a *Bloomberg* report summarized it, the second-quarter results are "a sign that the burrito chain is still reeling from a food-safety crisis that drove away customers and tarnished its reputation."

137. In October 2016, investment bank Raymond James issued an analyst report stating that it is "increasingly of the view that [Chipotle's] lost sales (still down 15% to 20% nearly a full 12 months after the initial E.coli incident) could prove to be more permanent in nature." That same month, Chipotle reported that its profit had fallen 95% in the prior quarter, and its same-store sales had fallen by another 21.9%, missing analysts' already pessimistic estimates of a 18.7% decline.

138. As of the date of this filing, Chipotle stock has lost nearly half of its value since August 2015. In early August 2015—before the initial outbreak—Chipotle's stock traded above $757 per share. Chipotle's closing price on December 23, 2016, the last full trading day before this filing, was $389.77 per share.

139. Defendants' failures in connection with the food-safety crisis also exposed the Company to litigation costs and the specter of potential liability. On January 8, 2016, a stockholder of the Company filed a class action complaint in the U.S. District Court for the Southern District of New York alleging that the Company, both of its co-CEOs (Defendants Ells and Moran) and its Chief Financial Officer violated Sections 10(b) and 20(a) of the Exchange Act and related rules. The complaint is based on the Company's alleged failure to disclose material information about the Company's quality controls and safeguards in relation to consumer and employee health. The litigation is captioned *Susie Ong, et al. v. Chipotle Mexican Grill, Inc., M. Steven Ells, Montgomery F. Moran, and John R. Hartung*, C.A. No. 1:16-cv-00141-KPF. Also ongoing is class action litigation brought by consumers who allege they were sickened as a result of the food-safety crisis, including an action pending in the Central District of California with the caption *H.C.L., et al. v. Chipotle Mexican Grill, Inc.*, No. 2:16-cv-00399-PA (JEM).

140. Chipotle's discounts and promotions have failed to repair the Company's sales. On September 21, 2016, Mark Kalinowski, an analyst at Nomura Securities, was quoted in the *The New York Times* as follows: "When you're giving away food, it's discounting — and to me, this isn't a brand built on discounting, so it creates some new questions about the future." The article goes on to state flatly that "Dr. Marsden and the [C]ompany have their work cut out for them."

141. Dr. Marsden has admitted that the Company needed an approach it simply did not have before. "Anybody can spray a bunch of chemicals around and improve food safety," Dr. Marsden has been quoted as saying about Chipotle's food safety. "This was going to require something more innovative and different."

## DERIVATIVE ALLEGATIONS

142. Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of breaches of fiduciary duties by the Defendants.

143. Plaintiff currently owns Chipotle stock and has owned Chipotle stock continuously during the relevant period.

144. Plaintiff will adequately and fairly represent the interests of Chipotle and its stockholders in enforcing and prosecuting their rights, and has retained counsel competent and experienced in stockholder derivative litigation.

## DEMAND ON THE BOARD IS EXCUSED AS FUTILE BECAUSE A MAJORITY OF THE BOARD FACES A SUBSTANTIAL LIKELIHOOD OF LIABILITY

145. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

146. The current Chipotle Board (the "Demand Board") consists of twelve directors. Eight of those directors are defendants in this action: Defendant Ells, Defendant Baldocchi, Defendant Charlesworth, Defendant Flanzraich, Defendant Flynn, Defendant Friedman, Defendant Gillett and Defendant Musk (the "Defendant Directors").

147. The four other current directors are Paul Cappuccio, Robin Hickenlooper, Ali Namvar, and Matthew Paull, each of whom were appointed to the Chipotle Board on December 14, 2016, shortly after Defendant Moran stepped down from his position as a director on December 9, 2016.

148. Plaintiff has not made a demand on the Demand Board to institute this action against the Defendants. Such demand would be a futile and useless act because the Defendant Directors constitute a majority of the Demand Board and face a substantial likelihood of liability

and possible monetary penalty if the claims alleged herein were to be properly investigated and prosecuted.

149. Each of the Defendant Directors had actual knowledge of the Company's repeated failures in preventing food-borne illness from originating in its restaurants, through media coverage and/or the deficient reporting systems in place at the Company. Nonetheless, the Defendant Directors failed to act, which constitutes a conscious disregard of their duties and/or bad faith. Investigating or prosecuting the claims alleged herein could therefore expose a majority of the Demand Board to liability to consumers, regulators and stockholders.

150. Further, Defendant Ells is a defendant in a federal securities action alleging material misstatements regarding food safety in the Company's public filings. That action involves facts that significantly overlap with Plaintiff's allegations, and thus any investigation or prosecution of the claims alleged herein could undermine Ells's defenses in the federal securities action.

151. Not only would Ells be unlikely to institute this action against the Defendants, but each of the Defendant Directors would be unlikely to take such action as each has sold Chipotle stock and none would be inclined to discover facts that could implicate their insider trading. Indeed, Ells, Friedman, Charlesworth and Flynn, all sold over $1 million in Chipotle stock between the time the Board was formally put on notice of widespread food safety issues in December 2014, and when the first massive outbreak occurred in August 2015.[17] Thus, the Defendant Directors cannot independently assess a demand to investigate and prosecute the claims alleged herein due to the high likelihood that such investigation would result in their personal liability for, among

[17] The Company's then co-CEOs, Moran and Ells, who possessed significant control over the Company's operations as both directors and officers, disposed of hundreds of millions of dollars in Chipotle stock during that period.

other things, fraud and/or insider trading. For this additional reason, demand on the Board is excused as futile.

152. The Company has been substantially damaged as a result of the Defendant Directors' knowing breaches of, or bad faith disregard for, their fiduciary duties.

153. The Defendant Directors' breaches of fiduciary duty and other misconduct have subjected the Company to a myriad of harms, including:

A. The massive loss of revenues and goodwill caused by customers' lost trust in the Company's operations;

B. Potentially irremediable reputational harm;

C. Dramatic reduction in growth;

D. Federal securities fraud class action lawsuits against the Company's co-CEO and Chairman, former co-CEO, and Chief Financial Officer, which are currently pending in the United States District Court for the Southern District of New York (the "Securities Fraud Class Actions");

E. Various federal investigations;

F. Increased difficulty in and cost of arranging new financing for the Company; and

G. Undue marketing costs.

154. In light of the breaches of fiduciary duty perpetrated by a majority of the Demand Board and their collective bad faith failure of oversight, they face a substantial likelihood of liability in this derivative action as well as potential criminal or civil actions. Thus, a majority of the board of directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## COUNT I

## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST THE DEFENDANTS

155. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

156. The Defendants, as Chipotle directors and officers, owed Chipotle the utmost fiduciary duties of care and loyalty. By virtue of their positions as directors and officers of Chipotle and their exercise of control and ownership over the business and corporate affairs of the Company, the Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. The Defendants were required to: (a) use their ability to control and manage Chipotle to properly and diligently oversee and protect the Company's interest from known substantial risks, and (b) act in furtherance of the best interests of Chipotle and its stockholders.

157. Despite recognizing that the Company's business model was highly dependent on various high-risk practices, including use and on-site preparation of fresh ingredients, the Board failed to take adequate steps to ensure that (a) Chipotle implemented adequate food safety protocols, (b) Chipotle would not be harmed by lapses in its food safety protocols, (c) Chipotle was properly monitoring food safety practices as it rapidly—and indeed overzealously—grew operations to almost 2,000 restaurants, (d) Chipotle was adequately responding to incidents of food-borne illness arising from its restaurants, and (e) Chipotle was prepared to respond to the devastating fallout of a potential outbreak of food-borne illness caused by one or more of its restaurants.

158. Further, after learning of initiatives that increased the risk of food-borne illness at the Company, the Board failed to implement appropriate and necessary safety measures.

159. In addition, the Defendants knew of outbreaks of food-borne illness caused by Chipotle restaurants and consciously failed to address them at Board and Board committee meetings, let alone remedy the systemic failures that caused the outbreaks.

160. Because the Board was repeatedly warned of and recognized—yet ultimately ignored—lapses in food safety protocol and employee comprehension of proper food safety practices, the Defendants have acted in bad faith.

161. As a consequence of the Defendants' bad faith conduct and breaches of their fiduciary duties, the Company has been harmed.

**COUNT II**

**DERIVATIVE CLAIM**
**FOR VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT**
**AGAINST THE DEFENDANTS**

162. Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

163. The Defendants—with the exception of Gillett as to the 2014 Proxy Statement (defined below)—issued, caused to be issued, and participated in the issuance of the Company's 2014 and 2015 Proxy Statements (the "2014–2015 Proxy Statements"),[18] which included omissions of material fact.

[18] The 2014-2015 Proxy Statements were filed with the SEC on March 27, 2014 and March 26, 2015, respectively.

164. The 2014–2015 Proxy Statements contained proposals to Chipotle's stockholders that they vote to reelect members of the Board. The 2014–2015 Proxy Statements, however, omitted information highly relevant to the Board members' competence and the quality of their stewardship, including: (i) that the Company lacked adequate information and reporting systems that would provide timely, accurate information concerning serious food safety incidents; (ii) that the Company's existing systems were such that senior management had ceased reviewing food safety audit reports; (iii) that no additional food safety measures were implemented to manage the increased health risks associated with the Company's scratch-cooking initiative; (iv) the content of internal audit reports, including as pertains to Chipotle's adherence to industry-standard health codes and the prevalence of Chipotle employees' noncompliance with the Company's food preparation procedures.

165. By reason of the conduct alleged herein, Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of the Defendants' wrongful conduct, Chipotle misled and/or deceived its stockholders by making material omissions and/or misleading statements that were an essential link in stockholders heeding Chipotle's recommendation to reelect Defendants to the Chipotle Board.

166. The information omitted from the 2014–2015 Proxy Statements was material to Chipotle's stockholders in determining whether or not to reelect members of the Chipotle Board. The proxy solicitation process in connection with the 2014–2015 Proxy Statements was an essential link in the election of nominees to the Board.

167. Plaintiff, on behalf of the Company, therefore seeks relief for damages inflicted upon the Company in connection with the improper election of Defendants based upon the false

and misleading 2014–2015 Proxy Statements, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

168. This action was timely commenced within three years of the 2014–2015 Proxy Statements and within one year from the time that Plaintiff discovered or reasonably could have discovered the facts upon which the Complaint is based.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Finding that demand on the Demand Board is excused as futile;

B. Finding the Defendants liable for breaching their fiduciary duties;

C. Finding the Defendants are liable for violating the Exchange Act;

D. Awarding the Company compensatory damages, together with pre-and post-judgment interest;

E. Directing Chipotle to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein;

F. Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants' and experts' fees; and

G. Awarding such other and further relief as is just and equitable.

DATED: December 27, 2016

*/s/ Jeffrey A. Berens*
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, CO 80238
Tel: (303) 861-1764
Fax: (303) 395-0393
jeff@jberenslaw.com

LABATON SUCHAROW LLP
Ned Weinberger
Thomas Curry
300 Delaware Ave., Suite 1340
Wilmington, DE 19801
Tel: (302) 573-2540
NWeinberger@labaton.com
TCurry@labaton.com

ANDREWS & SPRINGER LLC
Peter B. Andrews
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel: (302) 504-4957
pandrews@andrewsspringer.com
cspringer@andrewsspringer.com

*Attorneys for Plaintiff*

## VERIFICATION

I, Cyrus Lashkari, hereby verify that I have authorized the filing of the attached Stockholder Derivative Complaint (the "Complaint"), that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 23, 2016

Cyrus Lashkari